FILED
2011 Dec-09  AM 10:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN  DIVISION

| | | |
|---|---|---|
| **SILVADNIE QUAINOO,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **5:10-cv-104-AKK** |
| **CITY OF HUNTSVILLE,** | ) | |
| **ALABAMA,** *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Silvadnie Quainoo ("Plaintiff") brings this civil action against the City of Huntsville (the "City") and individually against Officers Jennifer Denise Watkins and Hunter J. Aldridge, collectively ("Defendants").  Doc. 1.  The parties have filed cross motions for summary judgment, docs. 30-32, 34, and the motions are fully briefed.  Plaintiff also moved to strike select portions of Defendants' evidentiary material.[1]  Doc. 40.  For the reasons stated below, Defendants' motions

---

[1] Because Watkins provided similar testimony to the portion of Kevin O'Connell's testimony Plaintiff seeks to strike, *see* Doc.35-12, at 6-7 ("Based on [Watkins'] training, [she] viewed [Plaintiff's] type of behavior as threatening and aggressive".); *see also* doc. 35-2, at 72-76 (Watkins gives her interpretation of the frisk while watching the police video during her deposition), the court saw no need to consider the disputed O'Connell testimony.  Thus, Plaintiff's motion to strike is **MOOT**.  Moreover, even if the court strikes the testimony in question, Defendants' motions for summary judgment are still due to be **GRANTED**, in part.

1

are due to be **GRANTED** in part and **DENIED** in part, and Plaintiff's motions are due to be **DENIED**.

## I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

_____

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II.  FACTUAL BACKGROUND

When evaluating Defendants' motion for summary judgment, the court resolves all factual disputes in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). Likewise, when evaluating Plaintiff's own partial motion for summary judgment, the court resolves all factual disputes in Defendants' favor

when sufficient competent evidence supports Defendants' version of the disputed facts. *Id.*

### A.   <u>Officer Watkins Initiates a Traffic Stop</u>

On February 6, 2008, while on duty as a police officer for the Huntsville Police Department ("HPD"), doc. 35-12 ¶ 3,  Officer Watkins ("Watkins") parked her patrol car in an apartment parking lot near the corner of Rideout Road and Oakwood Road in Huntsville.  *Id.*  Around 4:15 p.m., Watkins observed a Silver Ford Mustang, driven by Louia McDonald ("McDonald") and in which Plaintiff was the sole passenger, speeding.  *Id.*  Watkins activated her blue lights and immediately pulled behind the Mustang.  Doc. 35-2, at 131.  McDonald failed to immediately pull over although there were several safe places to stop and instead drove approximately a quarter of a mile before stopping.  *Id.* at 127, 188-89.  McDonald contends he slowed down and quickly stopped once he found a safe place to do so.  Doc. 35-9 ¶ 2.

### B.   <u>Watkins Makes Contact With the Driver and Conducts a Weapons Frisk of McDonald and Plaintiff</u>

Prior to approaching the Mustang, Watkins called for backup.  Doc. 35-2, at 139.  Officer Gerald Turner ("Turner") arrived first to assist Watkins.  *Id.* at 140; doc. 35-4, at 6.  Because McDonald took too long to pull over, Watkins felt she

needed to conduct a weapons frisk to ensure that neither McDonald nor Plaintiff possessed a weapon.  Doc. 35-2, at 123.  Consequently, Watkins and Turner requested McDonald and Plaintiff to exit the vehicle, and both complied.  Watkins instructed Plaintiff to stand by the trunk and she then frisked McDonald.  *Id.* at 144, 228.  McDonald was cooperative, compliant, and kept his hands on the car. Doc. 33, at 7; doc. 45, at 8; video 16:20:44-16:21:08.[2]  McDonald stated, "Although I felt [the search] was unwarranted under the circumstances, it was professional and not intrusive."  Doc. 35-9 ¶ 3.

As Watkins frisked McDonald, Officer Aldridge ("Aldridge") arrived at the scene.  Doc. 35-2, at 234-35.  His patrol car's camera captured the ensuing events that are at issue in this case.  *Id.*  While Watkins frisked McDonald, Plaintiff stood by the passenger side of the Mustang with Turner.  Doc. 35-2, at 228-29; doc. 35-4, at 7.  After Turner told Plaintiff to place her hands on the Mustang, doc. 35-1, at 142,  Plaintiff repeatedly drummed her hands on the trunk of the car, which the officers interpreted as an aggressive hand gesture.[3]  Doc. 33, at 8; video 16:21:31-

---

[2] The citations to video footage correspond to the time of day, the hour, minute, and second displayed on the video.

[3] Although Plaintiff admits drumming her hands on the trunk of the car, she denies taking them off the vehicle or behaving aggressively. Doc. 35-1, at 156.  Rather, she contends she drummed her hands "just trying to pass time, trying to figure out what's going on, nervous, scared." *Id.*

16:2:44.

After Watkins finished frisking McDonald, she escorted McDonald to her patrol car and obtained his consent to search the Mustang.  Doc. 35-2, at 144; doc. 35-9, at ¶ 9; doc. 35-2, at 235-36.  Thereafter, Aldridge searched McDonald's car and Watkins frisked Plaintiff.[4]  Doc. 35-2, at 238.

Watkins started the frisk on Plaintiff's jacket because it was loose-fitting and had multiple pockets that could conceal a weapon.  Doc. 35-1, at 167-68; doc. 35-12, at ¶ 11.  Watkins felt and retrieved unknown objects that she identified thereafter as paper and pens.  Doc. 35-1, at 166-67.  Watkins also felt and retrieved an unknown rectangular object in Plaintiff's right rear pants pockets that she subsequently identified as a debit card.  *Id.*, at 157-58.  Additionally, Watkins also retrieved other objects from Plaintiff's front left pocket that she could not identify from her frisk.  *Id.*  Ultimately, Watkins searched all of Plaintiff's pants and coat pockets and examined the items she discovered, doc. 42-1, at ¶ 10, none of which constituted illegal contraband.

Watkins moved next to the waistband of Plaintiff's pants, doc. 35-2, at 273; doc. 35-1, at 160, even though Plaintiff claims that Watkins had already searched

---

[4]Watkins claims that she explained to Plaintiff why she removed Plaintiff from the car and her intent to conduct a weapons frisk, doc. 35-2, at 260, both of which Plaintiff denies, doc. 35-1, at 179.

that area, doc. 35-1, at 170-72. Allegedly, Watkins reached down Plaintiff's pants near Plaintiff's rear end and then immediately removed her hand.  Doc. 35-1, at 170-72.  During the search, Watkins, Turner, and Aldridge claim that Plaintiff repeatedly turned her head and body toward the officers and repeatedly removed her hands from the vehicle.  Doc. 35-3, at 94, 166-67; doc. 35-9, at ¶ 4.  Plaintiff asserts that she became agitated only when Watkins stuck her hand down Plaintiff's pants.  Doc. 35-2, at 272.  According to Watkins, "[Plaintiff] made some statements . . . . she wanted to know basically what I was doing, what was going on. . . ."  *Id.*, at 273-74.  When Watkins frisked the area in Plaintiff's waistband, "[Plaintiff] got very fidgety and agitated, and this is when she started giving us problems."  *Id.*, at 272.  Although Watkins and Turner told Plaintiff to keep her hands on the car, to remain still, and to calm down, Plaintiff turned towards Watkins and pushed off the car, prompting Watkins to push Plaintiff back on the car while simultaneously telling Plaintiff to keep her hands on the car.  *Id.*, at 260, 274-75.  Plaintiff denies pushing off the car and contends that she tensed up because Watkins reached down Plaintiff's pants.  Doc. 45, at ¶ 32. In any event,  Plaintiff continuously demanded to know "what was going on." Doc. 35-1, at 180-81.

C.     **Watkins Places Plaintiff Under Arrest and Aldridge Sprays Plaintiff With OC Spray**

Watkins decided to handcuff Plaintiff because Plaintiff continued to turn toward the officers, failed to comply with their commands, and yelled repeatedly. Doc. 35-12, at ¶ 12.  While the officers tried to handcuff her, Plaintiff allegedly continued to struggle with Watkins and Turner, doc. 35-2, at 300; doc. 35-4, at 48-49, and even afterwards, Watkins felt Plaintiff would not allow her to continue with the weapons frisk.

After feeling the car move when Watkins and Turner pressed Plaintiff against it, Aldridge stopped searching the car and approached Plaintiff.  Doc. 35-2, at 304.  Watkins then asked Aldridge to spray Plaintiff with oleoresin capsicum ("OC") spray.[5]  Despite warnings that they would spray her with OC spray if she did not calm down and stop resisting, allegedly, Plaintiff continued to turn toward the officers, swing her elbows, push off the car, and failed to comply with the officers' commands.  *Id.*, at 301-02; doc. 35-3, at 107-08.  Consequently, believing that Plaintiff continued to act in an aggressive manner, Aldridge sprayed her with two bursts of OC spray, even though Plaintiff was handcuffed and surrounded by the three officers.  Doc. 35-3, at 159; video 16:24:18; doc. 45, at ¶ 43.  The officers

---

[5]Commonly known to as pepper spray.

contend they had to utilize the OC spray to gain control of Plaintiff so Watkins could complete the frisk and effect the arrest.  Doc. 35-3, at 49-50.

Although Plaintiff admits she was upset and failed to calm down when Aldridge asked her to do so, she denies moving aggressively and contends she only turned her head and upper torso towards the officers to protest the frisk and to demand answers.  Doc. 45, at ¶ 40.  Plaintiff contends also that Watkins had substantially, if not completely, searched her by the time Aldridge sprayed her with the OC spray. *Id.*, at ¶ 43. Also, Plaintiff denies struggling or yelling before Watkins handcuffed her, and maintains that she only verbally protested the manner of the search.  *Id.*, at 11.  Plaintiff further alleges she only turned her head to speak with the officers as they handcuffed her.  *Id.*

After Aldridge sprayed Plaintiff, he called for emergency medical personnel ("HEMSI") to decontaminate Plaintiff.  Doc. 35-4, at 92-93.  In the interim, Turner escorted Plaintiff to a curb, sat her down, and rinsed her face and eyes with bottled water.  *Id.*, at 91-92.  Simultaneously, Watkins issued McDonald a traffic citation for speeding and allowed him to leave.  Doc. 35-2, at 142. Watkins then attempted to complete the weapons frisk, but stopped due to the effects of the OC spray on her. Doc. 35-2, at 255.  Plaintiff contends that Watkins continued frisking her for at least another two minutes, and never showed adverse effects from the spray.  Doc.

45, at ¶ 49 n.9; video 16:24:30-16:26:50.  In any event, Watkins decided to transport Plaintiff to the jail since she had decided to arrest Plaintiff for obstructing governmental operations.  Doc. 35-2, at 299.  Prior to doing so, Watkins stated her intention to "strip search" Plaintiff at the jail due to Plaintiff tensing up during the weapons frisk.  Video 16:39:50-16:40:10.

Once at the jail, HEMSI decontaminated Plaintiff.  *Id.*, at 325-27.  Watkins took Plaintiff into the women's bathroom and searched her upper body, including her chest area, for weapons.  Doc. 35-1, at 253-56; doc. 35-2, at 240-41, 246-47.  Watkins lifted, but did not remove Plaintiff's shirt. Doc. 35-1, at 257-58. After she completed the search, Watkins booked Plaintiff and released her the following morning, February 7, 2008.  *Id.*, at 269-70.

D.    **Plaintiff Files a Complaint to HPD"S Internal Affairs Division**

That same day, Plaintiff filed a written complaint with the Internal Affairs Division ("IA") and subsequently met with IA investigator P.T. Smith ("Smith").  Doc. 35-14.  Smith also interviewed Watkins, Turner, and Aldridge, reviewed the video from Aldridge's vehicle,  and unsuccessfully attempted to contact McDonald.  Doc. 35, at 12, 16-17, 60.  After his investigation, Smith found Plaintiff's allegations unfounded.  *Id.*, at 40.  Huntsville personnel also reviewed the incident and concluded that Watkins and Aldridge acted properly.  Doc. 35-6, at 47-49.

10

E.      **Police Training and Procedure**

HPD follows a written directive known as the Use of Force, which it

implemented "[t]o establish uniform regulations and provide guidelines regarding

use of force by Sworn Personnel."  Doc 35-16, at 21.  The Use of Force Directive,

issued by the Chief of Police, provides for a five-level continuum from the least

amount of force to the greatest: (1) officer presence, (2) verbal command, (3)

empty hand techniques,[6] (4) intermediate weapons,[7] and (5) deadly force. Doc. 35-

16, at 25-29. An officer has the discretion to use level three techniques regardless

of whether the suspect is handcuffed or is being handcuffed.  Doc. 35-6, at 40-41.

Huntsville police officers are trained at the City's police academy to look for

signs and signals of possible aggression.  Moreover, the officers "are trained they

can use force at the third level, up to and including pepper spray, if they

subjectively perceive a safety risk . . . " and escalation to a baton and strike

technique or deadly force is not justified. Doc. 45, at 17; doc. 49, at 4.  Plaintiff

claims that level three techniques constitute the majority of HPD uses of force and

that it is virtually impossible for HPD to find the use of third level force as

---

[6]Empty hand techniques include both soft (open hand and gripping) and hard (striking) hand techniques, take downs, knee strikes, OC spray, and using a baton as a restraint.  Doc. 35-16, at 26.

[7]Intermediate weapons include chemical agents other than OC, less lethal extended range impact devices, lateral vascular neck restraints, and baton strikes.  *Id.*, at 27.

excessive.  Doc. 45, at 16-17.

Furthermore, HPD trains its officers to retrieve objects they cannot exclude as weapons during a weapons frisk:  "If [an officer] perceive[s] [the object] as a weapon or it's a known hiding location for weapons, [the officer is] allowed to take and make sure it is, in fact, not a weapon or is a weapon."  Doc. 35-6, at 51.

Plaintiff alleges that the HPD has an unwritten rule against investigating allegations of false arrest until the person returns to IA after the conclusion of their case.  Plaintiff further alleges that HPD does not hold accountable officers who file false charges.  *Id.*, at 18.  HPD disagrees.  Sergeant Bernie Steadham ("Steadham"), the Commander of IA, during the relevant period, testified that IA may investigate allegations of false arrest under the categories of abuse of authority or violation of a written directive.[8]  Doc. 35-5, at 175-76; doc. 45, at 17-18.

Moreover, Plaintiff asserts that it is common knowledge that HPD officers use obstructing government operations as a common charge to cover their misconduct.  Doc. 45, at 18.  Although Defendants admit obstructing governmental operations or disorderly conduct charge is involved in a high percentage of cases, they contend the charge arises in many cases where there are only "complaints" of

---

[8]  The Chief of Police has delegated the "internal investigation function" to the Commander of IA.

police misconduct, rather than where actual police misconduct has occurred.  Doc.

49, at 5.[9]

### III.  Analysis

Plaintiff's Complaint contains six counts.  Doc. 1.  Specifically, Counts I, II,

and III allege that the "individual defendants" violated the Fourth and Fourteenth

Amendments by (1) subjecting Plaintiff to an unlawful seizure and false arrest

pursuant to a City policy and custom (Count I); (2) conducting an unlawful search

against Plaintiff and falsely arresting Plaintiff pursuant to a City policy and custom

(Count II ); and (3) using excessive force in arresting Plaintiff and that they falsely

arrested her pursuant to a City policy and custom (Count III).  *Id.*  Plaintiff also

seeks to hold the City liable for her federal claims asserted in Counts I, II, and III.

Next, Counts IV, V, and VI allege that, in violation of state law, the "individual

defendants" (1) searched Plaintiff unreasonably and without a warrant, probable

cause or reasonable suspicion (Count IV); (2) falsely arrested/imprisoned Plaintiff

(Count V); and (3) assaulted and battered and used excessive force on Plaintiff

(Count VI). *Id.*  Also, Plaintiff alleges that the City is liable for Counts IV, V, and

VI because the officers acted within the line and scope of their employment.

---

[9]Between January 1, 2000, and December 31, 2010, the HPD dismissed approximately 25% of the obstructing governmental operations charges. Doc. 49, at 5; doc. 45, at 18.

Defendants move for summary judgment on all claims.  Docs. 30-32.
Plaintiff moves for partial summary judgment against Watkins regarding her §
1983 unlawful search, excessive force, and unlawful seizure claims, and against
Aldridge regarding her § 1983 excessive force claim. Doc. 34. The court will
address first Plaintiff's federal claims in subsection A and then the state claims in
subsection B.  As shown below, the court finds that summary judgment is due to be
granted on all claims against the City and for Aldridge on Counts I, II, IV, and V,
and denied as to all other claims.

## A.    Federal Claims

As it relates to the federal claims alleged in Counts I, II, and III, the court
first addresses the City's liability and finally the claims against Wakins and
Aldridge's liability.

### 1.    *Municipal Liability*

The starting point for the court's analysis is 42 U.S.C. § 1983, which creates
a cause of action against persons who violate the Constitution and federal laws
while acting under state government authority:  "[e]very person who, under color of
any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or
causes to be subjected any citizen . . . to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be liable to the party injured

14

in an action at law . . . ." Section 1983 applies to municipalities; however,

municipalities cannot be held liable on a *respondeat superior* theory.  *Monell v.*

*Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978); *see also Leatherman v.*

*Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166

(1993).  In other words, a municipality is responsible for its own acts but not the

acts of its employees.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986).

Thus, a municipality is liable under section 1983 only "when execution of a

government's policy or custom . . . inflicts the injury."  *Monell*, 436 U.S. at 694. "A

policy is a decision that is officially adopted by the municipality, or created by an

official of such rank that he or she could be said to be acting on behalf of the

municipality."  *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citations

and quotation marks omitted).  "A custom is a practice that is so settled and

permanent that it takes on the force of law."  *Id*. (citations and quotation marks

omitted).  "In order for a plaintiff to demonstrate a policy or custom, it is generally

necessary to show a persistent and wide-spread practice."  *McDowell v. Brown*, 392

F.3d 1283, 1290 (11th Cir. 2004) (citations and quotation marks omitted).

Therefore, in order to establish § 1983 liability against a municipality the plaintiff

must show the individual carried out the alleged actions pursuant to either (1) a

policy, ordinance, regulation or decision officially adopted and promulgated by the

municipal's duly-authorized policymakers; or (2) a custom even though such a custom has not received formal approval through the municipal's official-decision making channels. *Monell*, 436 U.S. at 690-91.

In this case, Plaintiff alleged in Counts I, II, and III that Watkins and Aldridge violated her Fourth and Fourteenth Amendment rights pursuant to the City's policies and customs – in particular, a failure of the City to investigate, discipline, or prosecute misconduct, including incidents of false arrest, unlawful searches, and excessive force.  Doc. 1, at 4-7.

### a.      *Count I - Illegal Seizure*

Count I alleges that "individual defendants" "arrested [P]laintiff without probable cause, thereby depriving [P]laintiff of her rights under the Fourth and Fourteenth Amendments . . . ." *Id*., at 4. Again, for the City to be liable for the acts of the officers, Plaintiff must show that the City has an officially promulgated policy or an unofficial custom that allows for false arrests.  *Monell*, 436 U.S. at 658.  Furthermore, to demonstrate that the City has a custom of false arrests, Plaintiff needs to show a persistent and wide-spread practice throughout the city. *McDowell,* 392 F.3d at 1290.  The custom must also evidence the City's "deliberate indifference" to constitutional violations.  *Id*., at 1289.

To meet her burden, Plaintiff contends that the City has chosen to "turn a

16

blind eye to its officers' misuse of their arrest power, as a matter of policy refusing

to investigate claims of false arrest." Doc. 45, at 40. However, the only supporting

evidence Plaintiff offers for this contention is the City's 25% dismissal rate for

obstructing governmental operations charge. *Id.* According to Plaintiff, the 25%

dismissal rate is proof that the City partakes in "a widespread practice that,

although not authorized by written law or express municipal policy, is so

permanent and well settled as to constitute a custom or usage with the force of

law." *Id.* (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th

Cir. 1991) (internal quotes omitted)). However, a high number of dismissals alone

is insufficient to establish that the City has a custom of false arrests because "there

can be many reasons why a criminal case is dismissed . . . ." *See Gold v. City of

Miami,* 151 F.3d 1346, 1351 (11th Cir. 1998). In fact, here, a 25% dismissal rate

might also equally suggest that 75% of the arrests are proper, which in itself would

belie Plaintiff's contention that the City has a custom or practice of false arrests.

Moreover, significantly, the decision to dismiss a charge does not mean that the

predicate arrest is improper. Rather, it may mean the arresting officer eventually

corroborated the suspect's story and, as a result, dismissed the charge.

Furthermore, the dismissal rate here may simply indicate, contrary to Plaintiff's

contentions, that the City has policies in place to ensure the protection of

17

constitutional rights and that when it sees no basis exists to pursue a charge, it dismisses it.  In any event, since the case law is clear that evidence of a dismissal rate alone is insufficient to establish a custom or widespread practice, *see id.*, the court declines to find one here.

In addition to the dismissal rate, Plaintiff offers evidence of four similar incidents IA reviewed in which it found no misconduct.  Doc. 45, at 19.  Plaintiff contends that the failure to find misconduct suggests that the City has a policy or an unofficial custom that allows for false arrests.  Again, Plaintiff misses the mark because "the number of complaints bears no relation to their validity."  *Salter v. McNesby*, No. 3:06cv110, 2007 WL 698931, at *3.  *See also Wakefield v. City of Pembroke Pines,* No. 07-11687, 2008 WL 698931, at *3 (11th Cir. Mar. 17, 2008) (holding two complaints against defendant officer over thirteen months insufficient to establish custom).  Stated differently, just because IA rejected four complaints against officers does not mean that the complaints had merit or that IA improperly rejected them.  In fact, the investigations may indeed have established that the complaints had no merit.

Plaintiff provides  no other evidence to show that the City has a persistent and widespread practice of failing to investigate, discipline, and prosecute its officers.  Nor does Plaintiff give any evidence that the City's policy-making

officials "were aware of any pattern of police misconduct . . . let alone that they were deliberately indifferent to it." Doc. 33, at 37. Therefore, all the court has are mere assertions with very little supporting evidence. In the final analysis, the 25% dismissal rate and the four complaints rejected are simply insufficient to establish the high threshold necessary for municipal liability. As the Eleventh Circuit has held, "[t]his high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983." *Gold*, 151 F.3d at 1351 n.10. Where, as here, Plaintiff's evidence does not meet the high standard of proof required, no basis exists to hold the City liable for the acts of its officers. Summary judgement in favor of the City is therefore due to be **GRANTED** on Count I.

    **b.**    *Counts II and III - Unlawful Search and Excessive Force*

In Counts II and III, Plaintiff contends that the officers conducted the search and used the OC spray pursuant to the City's policies. Doc. 45, at 36. Specifically, Plaintiff asserts that the City has two unconstitutional policies. First, that HPD policy and training gives officers unlimited discretion to use level three force without regard to proportionality and based solely on the officers' subjective perception of the threat. Doc. 45, at 39. Second, that officers "are given discretion

19

to remove virtually any object from the pocket of a person subject to a weapons frisk regardless of whether the object feels like a weapon and based solely on the officer's subjective perception of a safety risk." *Id.*

Again, a municipality is liable under § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy, statement, or ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell,* 436 U.S. at 690. Moreover, "[a] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citations and quotation marks omitted). When a municipal policy itself violates federal law, or directs a municipal employee to do so, resolving "issues of fault and causation is straightforward." *Am. Fed'n of Labor v. City of Miami*, 637 F.3d 1178, 1187 (11th Cir. 2011). However, "[i]f a facially-lawful municipal action is alleged to have caused a municipal employee to violate a plaintiff's constitutional rights, the plaintiff must establish that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Id.* (citations and quotation marks omitted).

Contrary to Plaintiff's assertions, the City's policies do not give officers unlimited discretion to conduct warrantless searches and use force. To the

20

contrary, the City's written directive on use of force clearly states: "Sworn

Personnel will use only the degree of force that is objectively reasonable to

accomplish *lawful* objectives and bringing an incident/person under control.

Nothing in this written directive will constitute justification for reckless or

criminally negligent behavior amounting to an offense against a person."  Doc. 35-

16, at ¶ 2 (emphasis added).  The directive also stresses "that the use of force is not

left to the unfettered discretion of the involved officer . . . [and] use of force must

be objectively reasonable based on the totality of the circumstances."  *Id.*, at ¶ 7.

Moreover, a written directive on warrantless searches and seizures requires officers

to "conduct all warrantless searches and seizures consistent with current *laws and*

*regulations mandated by the state and federal government.*"  *Id.*, at ¶ 5(A)

(emphasis added).

    Based on the court's review of these directives, it is apparent from their

language that the City's policies are not facially unconstitutional and that, in fact,

they  require officers to abide by state and federal laws.  Because the City's policies

are "facially lawful" and do not give officers unlimited discretion, the City cannot

be held liable for the acts of its employees unless Plaintiff establishes that the

"municipal action was taken with deliberate indifference as to its known or obvious

consequences" of its policies.  *Am. Fed'n of Labor*, 637 F.3d at 1187 (internal

quotation marks omitted).  Plaintiff failed to meet this burden because she did not

provide any evidence that the City knew its policies would result in constitutional

violations.  Summary judgement is therefore due to be **GRANTED** in favor of the

City on Counts II and III.

### 2.  *Watkins and Aldridge's Liability on Federal Claims*

The court turns now to the federal claims against the individual Defendants

and the individual Defendants' contentions that they are due summary judgment on

qualified immunity grounds.  "The doctrine of qualified immunity protects

government officials 'from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Pearson v. Callahan*, 129 S. Ct. 808, 815

(U.S. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified

immunity balances two important interests – the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials

from harassment, distraction, and liability when they perform their duties

reasonably."  *Pearson*, 129 S. Ct. at 815.  "Because qualified immunity is 'an

immunity from suit rather than a mere defense to liability . . . it is effectively lost if

a case is erroneously permitted to go to trial.'"  *Id*. (quoting *Mitchell v. Forsyth*,

472 U.S. 511, 526 (1985)).

22

As a threshold matter, Plaintiff does not dispute that Watkins and Aldridge were engaged in a discretionary duty during the event in question. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Therefore, the burden shifts to Plaintiff to show that Watkins and Aldridge are not entitled to qualified immunity. *Id*. In *Saucier v. Katz*, the Supreme Court mandated a two-step sequence for addressing a claim of qualified immunity: (1) the court first decides whether the facts alleged or shown by a plaintiff make out a violation of a constitutional right, and (2) the court then decides whether the right was "clearly established" at the time of the alleged violation. 533 U.S. 194, 201 (2001). In *Pearson*, however, the Court held that courts need not adhere to the *Saucier*'s rigid two-step inquiry, and courts can decide the second question without reaching the first. 129 S. Ct. at 818.

### a.    *Count I - Illegal Seizure*

Count I alleges that "individual defendants" "arrested [P]laintiff without probable cause, thereby depriving [P]laintiff of her rights under the Fourth and Fourteenth Amendments . . . ." Doc. 1, at 4. To begin, although the complaint does not specifically name the individual officers with respect to Count I, it is clear from the record and the parties' submission that Watkins was the only officer to actually effect Plaintiff's arrest. Doc. 45. Therefore, on this basis alone, Aldridge is entitled to summary judgment.

23

"In the context of a claim for false arrest, an officer is entitled to qualified immunity where that officer had arguable probable cause, that is, where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiff." *Davis v. Williams*, 451 F.3d 759, 762-63 (11th Cir. 2006) (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)) (citation and internal quotation marks omitted). "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Crosby v. Monroe County*, 394 F.3d 1328 (11th Cir. 2004) (internal quotation marks omitted) (quoting *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

Watkins claims that during the frisk, Plaintiff continued to turn towards the officers, failed to comply with their commands, and yelled repeatedly, which prompted Watkins to handcuff Plaintiff. Doc. 35-12 ¶ 12. Watkins further contends Plaintiff still would not allow her to continue with the weapons frisk and that, as a result, she arrested Plaintiff for obstructing governmental operations. Plaintiff disagrees, denies resisting, and maintains that the only thing she did prior to Watkins handcuffing her was verbally protest the manner in which Watkins searched her body. Doc. 45, at 11. Plaintiff further contends that she only turned

her head to speak with the officers while Watkins handcuffed her, and, that by then, Watkins had substantially completed the search.  Doc. 45, at 11, 13.

Accepting Plaintiff's facts as true, Watkins lacked "arguable probable cause" to arrest Plaintiff because Plaintiff did not resist the frisk and only verbally protested the manner with which Watkins searched her.  Thus, a reasonable officer in the same circumstances and possessing the same knowledge as Watkins would not have believed probable cause existed to arrest Plaintiff for obstructing governmental operations.

In light of the factual dispute that a jury must resolve, Watkins' motion for summary judgment is due to be **DENIED**.[10] Likewise, for the same reasons, Plaintiff's motion for summary judgment on this issue is also due to be **DENIED** because, as the non-movant, the court must give all reasonable inferences to Watkins.  In other words, accepting Watkins' version of the arrest as true, the court must assume that Watkins had "arguable probable cause" to arrest Plaintiff because Plaintiff refused to comply with her commands and would not allow Watkins to frisk her. Whether Watkins or Plaintiff prevails will turn ultimately on whose version of the facts is correct. The court cannot resolve this factual dispute without

---

[10]Since Plaintiff makes no arguments against Aldridge as it relates to Count I, Aldridge's motion for summary judgment is due to be **GRANTED**.

making impermissible credibility determinations.  Thus, Plaintiff's and Watkins'
respective motions as to Count I are due to be **DENIED.**

###### b.      *Count II - Unlawful Search*

Count II alleges that "individual defendants" "searched [P]laintiff's person
without a warrant, without probable cause or reasonable suspicion, and in an
unreasonable manner . . . . Specifically, they violated [P]laintiff's right to be free
from unlawful searches."  Doc. 1, at 5.  Similar to Count I, the Complaint does not
specifically name individual officers with respect to Count II.  However, it is clear
from the record and the parties' submission that only Watkins frisked Plaintiff.
Doc. 45.  Therefore, on this basis alone, Aldridge is entitled to summary judgment.

Under the Fourth Amendment, a police officer is authorized to conduct a
warrantless weapons frisk to protect his or her safety where the officer has
reasonable belief that an individual is armed and dangerous.  *Terry v. Ohio*, 392
U.S. 1 (1968).  "When the stop is justified by suspicion . . . that criminal activity is
afoot, . . . the police officer must be positioned to act instantly on reasonable
suspicion that the persons temporarily detained are armed and dangerous.
Recognizing that a limited search of outer clothing for weapons serves to protect
both the officer and the public, the Court held the patdown reasonable under the
Fourth Amendment."  *Arizona v. Johnson*, 129 S. Ct. 781, 786 (2009) (citations

omitted).  "The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault."  *Sibron v. New York*, 392 U.S. 40, 65 (1968).  The Supreme Court treats drivers and passengers alike when evaluating the constitutionality of a weapons frisk.  *Id.*  "This protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause . . . must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others.  If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* . . . ." *Minnesota v. Dickerson*, 508 U.S. 366 (1993).  "When a law enforcement officer seeks summary judgment on the basis of qualified immunity, we determine only whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that [reasonable suspicion or] probable cause existed."  *Young v. Eslinger*, 244 F.App'x. 278, 279-280 (11th Cir. 2007) (internal quotations omitted).  Thus, an officer is entitled to qualified immunity if he or she has "arguable" reasonable suspicion to support an investigatory stop.  *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).

Watkins contends she had reasonable belief that Plaintiff was armed and

dangerous because McDonald failed to immediately pull over. Doc. 35-2, at 123.

Thus, Watkins felt McDonald and Plaintiff may have used the extra time to conceal

their weapons. *Id.* Further, Plaintiff wore a large, baggy, multi-pocketed jacket

that Watkins felt could have easily concealed weapons on her person. Doc. 33, at

19. Moreover, Watkins contends that she conducted a reasonable search because

she only removed items that she thought could be weapons. Doc. 35-1, at 166-67.

The court agrees with Watkins here given her view that the driver took an

unreasonable period to stop. Therefore, the court finds that a reasonable officer in

similar circumstances would have frisked the driver and Plaintiff to ensure neither

had any concealed weapons. However, when Watkins allegedly stuck her hand

down Plaintiff's pants "the protective search went beyond what [was] reasonably

necessary to determine if the [Plaintiff] was armed." *Minnesota v. Dickerson*, 508

U.S. at 366. Therefore, Watkins' motion is due to be **DENIED**. The court also

**DENIES** Plaintiff's partial motion for summary judgment since Watkins denies

sticking her hand down Plaintiff's pants and had reasonable suspicion to conduct

the outer frisk.

### c.    *Count III - Excessive Force*

Count III alleges that the "individual defendants" "assaulted and battered

Plaintiff . . . . Specifically, they violated Plaintiff's right to be free from excessive

28

force." Doc. 1, at 6. Plaintiff further argues that Defendants exceeded the amount of force required under the circumstances. Although Aldridge is the only officer who sprayed Plaintiff with OC spray, he did so at Watkins' direction. Therefore, this claim applies to both and, accordingly, the court considers the qualified immunity claims of both Watkins and Aldridge.

"In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." *Hadley*, 526 F.3d at 1329 (citations omitted); *see also Graham v. Connor,* 490 U.S. 386, 394-95 (U.S. 1989). The question is whether the "officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir. 2002); *see also Graham*, 490 U.S. at 396-97. Furthermore, "a court must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (quoting *Graham*, 490 U.S. at 396). The Eleventh Circuit considers several factors to determine "whether an officer's use of force was objectively reasonable, including '(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted, and (4) whether the force was applied in good faith or

maliciously and sadistically.'" *Id.* (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)). "[G]ratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330 (denying qualified immunity to officer who allegedly punched plaintiff while he was handcuffed and not resisting); *Fils,* 647 F.3d at 1290 (denying qualified immunity to officer who tased a non-resisting suspect who posed no risk); *Vinyard,* 311 F.3d at 1346 (denying qualified immunity to officer who grabbed plaintiff and applied pepper spray to her face even though the Plaintiff was handcuffed and secured in the back seat of patrol car); *see also Reese v. Herbert,* 527 F.3d 1253, 1273-74 ( 11th Cir 2008) (denying qualified immunity to an officer who applied pepper spray to a non-resisting suspect who was face-down on the ground being arrested by four officers and already had one hand handcuffed). Moreover, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Hadley*, 526 F.3d at 1330 (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)).

Here, Plaintiff claims that although handcuffed, surrounded by three officers, and purportedly not resisting arrest, Aldridge sprayed her with OC spray. Doc. 35-2, at 299-304. If Plaintiff's allegations are true – and that again is for the jury to

determine, the facts establish a violation of a well-established constitutional right to be free from excessive force.  Furthermore, because Watkins instructed Aldrige to apply the OC spray, she can be held liable for excessive force to the same extent as Aldridge.  *Hadley,* 526 F.3d at 1330.  Therefore, the court must **DENY** qualified immunity to Watkins and Aldridge on the excessive force claim.  Also, Plaintiff's motion for partial summary judgment on Count III is also due to be **DENIED** because a factual dispute exists as to whether Plaintiff was in fact compliant or resisting arrest as the officers contend.

**B.    *State Claims***

The court now turns to the state law claims – Counts IV, V, and VI.  The court first addresses the City's liability and then addresses Watkins and Aldridge's individual liability.

**1.       *Municipal Liability***

The relevant state law in question provides that: "No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty . . . ." ALA. CODE § 11-47-190 (1975).  Thus, "under § 11-47-190, a city is

31

liable for negligent acts of its employees within the scope of their employment, but

not intentional torts of its employees.*" Brown v. City of Huntsville, Ala.*, 608 F.3d

724, 743 (11th Cir. 2010).  Furthermore, a city is not liable for willful, reckless, or

wanton acts of its employees.  *See Altmayer v. City of Daphne*, 613 So. 2d 366, 369

(Ala. 1993) (holding that § 11-47-190 "absolves a municipality from liability from

the intentional torts of its agents," and also affirming trial court's determination

that § 11-47-190 barred plaintiffs' willful and reckless misrepresentation claim);

*Hilliard v. City of Huntsville*, 585 So. 2d 889, 892 (Ala. 1991) (holding that § 11-

47-190 does not include an action for wanton conduct).

    Here, Count IV alleges that the "individual defendants"  searched Plaintiff

without a warrant, probable cause or reasonable suspicion, and in an unreasonable

manner; Count V alleges that the "individual defendants" falsely arrested and

imprisoned Plaintiff; and Count VI alleges that the "individual defendants"

assaulted and battered and used excessive force on Plaintiff.  Doc 1. Moreover,

each count alleges that while acting within the line and scope of their employment,

the "individual defendants" actions were either negligent, wanton, malicious,

willful, or in bad faith.  *Id.*

    Therefore, to hold the City liable, Plaintiff must show that (1) Watkins and

Aldridge acted within the scope of their employment; and (2) their actions were

negligent, careless, or unskillful. *Brown*, 608 F.3d at 743. Only the second element

is at issue here, doc. 33, at 29 n.17, and in that regard, the Alabama Supreme Court

has held that when it is unclear whether a plaintiff's claim for "assault and battery,

false imprisonment and false arrest, actually asserted vicarious liability for an

intentional tort against the City, § 11-47-190 would not immunize the City where a

plaintiff alleges a factual pattern that demonstrates neglect, carelessness, or

unskillfulness." *Brown*, 608 F.3d at 743 (citing *Borders v. City of Huntsville,* 875

So. 2d 1168, 1183 (Ala. 2003)) (internal quotations omitted).

In other words, to prevail against a municipality, a plaintiff must show that

the officers' conduct was not intentional.  Here, although Plaintiff's complaint

alleges Watkins and Aldridge's acted either negligently, wantonly, maliciously,

willfully, or in bad faith, she failed to present facts to support her contention.

Instead, construing the facts in the light most favorable to Plaintiff, Watkins'

search, arrest, and command to use the OC spray, and Aldridge's actual use of the

OC spray, appear intentional. While Plaintiff contends "that the officers, though

acting in an objectively-unreasonable manner and thus negligently, did not act

willfully, maliciously, or in bad faith . . . , but rather based on a mistaken

understanding of Fourth Amendment law caused by the City's policies and

customs," doc. 45, at 44, she failed to support this assertion with facts establishing

that Watkins or Aldridge acted negligently, carelessly, or unskillfully. In fact, the City's policies make clear that it requires officers to comply with the Fourth Amendment. Doc. 35-16, at ¶ 5(A). Moreover, the City trained these officers on these policies. Doc. 45, at 12.  If, in fact, Plaintiff is correct that these officers frisked and arrested her without any probable cause and pepper sprayed her even though she was compliant, that is hardly the type of conduct that demonstrates negligence, carelessness, or unskillfulness.  To the contrary, as Plaintiff frames the facts, the conduct here was intentional, wanton, or reckless.  As such, because liability does not attach to municipalities for intentional*,* wanton, or reckless acts of its employees, summary judgment is due to be **GRANTED** on Counts IV, V, and VI, as they pertain to the City.

### 2.      *Watkins and Aldridge's Liability on State Claims*

Watkins and Aldridge contend that under ALA. CODE § 6-5-338(a) they are entitled to state-agent immunity from Plaintiff's state law claims,  because they were performing discretionary functions.  Doc. 33, at 38.  As stated previously, it is clear from the record and the parties' submissions that Watkins was the only officer to participate in the frisk and arrest of Plaintiff.  Therefore, Aldridge is due summary judgment on Counts IV and V - i.e. illegal search, assault, and false arrest/imprisonment claims.  In other words, Counts IV and V apply only to

34

Watkins and Count VI applies to both Watkins and Aldridge.

Municipal police officers have immunity from any "tort liability arising out of [their] conduct in the performance of any discretionary function within the line and scope of [their] law enforcement duties." ALA. CODE § 6-5-338(a).  However, as the Supreme Court of Alabama has explained, "[p]eace officers are not entitled to absolute immunity under § 6-5-338(a); rather, immunity from tort liability under § 6-5-338(a) 'is withheld if an officer acts with willful or malicious intent or in bad faith.'" *Ex parte City of Tuskegee*, 932 So. 2d 895, 906-07 (Ala. 2005) (quotation omitted).  Because, as discussed above, there are disputed issues of material fact regarding whether Watkins properly seized, searched, requested the use of the OC spray, and arrested Plaintiff, and whether Aldridge used excessive force by spraying Plaintiff with OC spray, the court declines to award immunity under state law to Watkins for Counts IV, V, and VI, and to Aldridge for Count VI.  Therefore, Aldridge and Watkins' motions for summary judgment are due to be **DENIED** on these claims.

## IV.  Conclusion

In sum, summary judgment is due to be **GRANTED** in favor of (1) the City on all counts; and (2) Aldridge on Counts I, II, IV, and V.  In all other respects, the

parties' respective motions are due to be **DENIED** as to all other counts.  The court

will enter a separate order granting in part and denying the motions for summary

judgment.

      **DONE** and ordered this 9th day of December, 2011.


_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE